## 28513.   SCOTT *v.* THE STATE.

Decided October 9, 1940.

*Benjamin Smith, Jon P. Knight,* for plaintiff in error.
*H. W. Nelson, solicitor-general, Bruce B. Greene, I. H. Corbitt,* contra.

GARDNER, J.   Aaron Scott was convicted of assault with intent to rape a small, nine-year-old white girl. The defendant was a negro man who lived and worked on a farm adjoining the farm on which the child lived with her father and mother. At the time of the alleged offense the father was in Florida, and the mother was away from the residence and in the field working, beyond the

pond from the house. The child's testimony, which we quote in the material parts, substantially covers the issues necessary for a determination of the assignment of error on the usual general grounds, the only assignment before us: "I have seen this negro man; all I know his name is Scott. He came to my mother's house on or about the 23rd day of May. He was sitting out there on the doorstep when I first saw him. I don't know how long he sat there. He sat there about ten or fifteen minutes, I reckon. I was washing dishes at the house at the time. When he left the doorsteps he went to the gate and looked up and down the road. I thought he was going home, but he didn't. Then he came into the house, the same house I was in. He went in the room and asked me who slept on the beds, and I told him, and he went in the fire room and picked up some cards and asked me how to play, and I was trying to tell him, and he took me and pulled me over to him and pulled up my clothes. He went into three rooms. He asked me who slept on the beds. He sat down on the beds. When he first came in the house he told me my dress was torn. My dress was torn down the hem. He asked me did I have on anything besides my dress, and I told him I did. He was out there on the porch when he asked me did I have on anything other than my dress. It is the side porch. Then he went in the house, and I went in behind him. He went in the back room and asked me who slept on the beds, and all. I told him who slept on the beds. He went in two other rooms besides the back. . . After leaving the bedroom he went in the living room. I went behind him to these bedrooms because I thought he was going to steal something. . . When he went in the living room he went to the davenport and picked up some cards and asked me how to play, and I was trying to tell him, and he caught hold of my arm and pulled me over to him and pulled up my clothes. He caught me by the arm; then he took my clothes and pulled them up. He held me by my left hand and pulled my clothes up with his hand. By my clothes I mean my dress. He pulled it up to along here [indicating]. He held it up about a minute, I reckon. Then he turned me loose and went on out of the porch and went out of the gate and went home, and he wanted me to mail some letters for him first, and when he went out of the gate he told me I had better not tell anybody he had been there, because it might get him in trouble and might get

me in trouble. After he left the house I went across the pond where Mamma was. No one else was at the house besides me when he was there. Mamma was hoeing peanuts. . . When the negro came to my house he came there with some letters to be mailed. . . When he handed me the letters . . he told me he would give me the change out of a dime. There were two letters. . . I had four cents left. . . Before I mailed the letters I went on by the field where my mother was. I had the letters and the change with me. I showed them to my mother. I went back to the house with Mamma and got Mamma's mail and mailed it too. . . When I got to the field I told my mother that he had been in the house. I didn't tell her anything else. I didn't tell her anything else until I come back from the mail box. . . I had already told her about him putting his hands on me, in the field, and told her the rest of it after I got to the house. I was scared. I was scared he might kill me. I thought he was going to kill me, . . that is all I was afraid he was going to do to me. He didn't harm me; he didn't hurt me."

While the foregoing evidence shows conduct most reprehensible, we do not think it shows beyond a reasonable doubt any intent on the part of the defendant to try to have carnal knowledge of the child. Whatever may have been his depravity of mind, as evidenced by his conduct in sitting on the beds, by his inquiries as to who slept on the beds, by asking the child what clothing she had on, and by pulling up her dress and holding it up for about a minute, there is no overt act beyond this stated conduct to indicate that the defendant had any intent to rape, or a striving to put it, if secretly conceived, into execution. The holding her by the hand and pulling her to him and raising her dress and keeping it up for about a minute, while strongly indicative of a vulgar and lustful thinking, could be said to have been, as to the child, only lascivious curiosity to peep, deriving therefrom a morbid satisfaction to the defendant. Under the principles laid down in *Dorsey* v. *State,* 108 *Ga.* 477 (34 S. E. 135), from which the headnote is quoted, we do not think the evidence was sufficient to convict. See *Little* v. *State,* 42 *Ga. App.* 222 (155 S. E. 352); *Pickett* v. *State,* 53 *Ga. App.* 478 (186 S. E. 206). In *Horseford* v. *State,* 124 *Ga.* 784, 786 (53 S. E. 322), it was held: "Before a conviction can be legally had, there must be no reasonable doubt, from the facts and

circumstances proved, of the existence of any one of such necessary ingredients of the crime," as set forth in *Dorsey* v. *State*, supra.

*Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*