The evidence is insufficient to sustain the verdict, for it fails as a matter of law to show beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis save that of the intent to commit rape, that the attack was made with that intent.
 DECIDED APRIL 6, 1945.
The defendant was convicted of an assault with intent to rape. He filed his motion for a new trial on the general grounds, to which he afterwards added two additional grounds, amplifying the general grounds. The court overruled the motion, and the defendant assigns error thereon. We will set forth the evidence concerning the attack, from which can be drawn any inference as to the intention of the attacker: "My name is Miss Grace Wilhite and I live at Sweet City in Elbert County, Georgia, on the highway leading from Elberton to Comer, Georgia. I live about six miles from Elberton on the right-hand side of the road. My father is L. H. Wilhite, and my mother is Sallie May Wilbite. I have a brother named Wallace Wilhite. On the 20th day of May this year, about eleven o'clock at night, I was attacked by someone at my home. I had just gone to bed and started coughing — had a real bad cold. I had on my night clothes. A lady told me to take soda water before I went to bed. I went on out through the living room where mother was. The water was not in the kitchen, and I went on the back porch. I was getting the water and felt something behind me, and I turned and ran and screamed, and he grabbed me, and scratched this shoulder. The back porch is screened and the water was on a table on the porch, right next to the door going into the yard, right at the door. The electric lights were on in the living room, dining room, and kitchen. Both doors joined the porch. Both lights shone on the porch. I went out the kitchen door. As I poured the water into a glass I looked over my left shoulder. As I looked around I saw him, and when I jumped he grabbed me. My neck had four scratches on it, with the blood running out on this shoulder. He did not get hold of me. I ran and screamed. . . It was around eleven o'clock at night when I was attacked, and I ran into the house screaming. At the time my father was in Brunswick working. My mother and little brother were at home at the time. When I turned around after pouring the water into the glass this party seemed to be standing on the steps, right at the door, just coming in. His arms or hands were just reaching when I looked. . . The only reason he didn't reach me was I was too quick. As I ran out of his grasp I was scratched on the neck and it brought the blood. . . I was in the front bedroom when I started out to the porch. I went through the living room where mother was, on through the *Page 304 
dining room into a bedroom, into the kitchen, and out on the porch. There was a drop light in the dining room and kitchen, both burning. The kitchen opens into the kitchen [porch?] to the right. The dining-room door opened inward to the left. The doors into both the kitchen and dining room were almost open and there was light on the porch but no drop light. There was an eating table on the porch. The steps from the ground into the screened porch are about twelve steps high and enter the porch near the wall of the kitchen. There is a screen door at the top of the steps, and it was not fastened, as we never fasten it. The table is right at the door on the opposite side from the kitchen. The table was about three feet into the porch from the screen or edge of the porch. The porch is about twelve feet wide and the table is next to the screen door. I was standing right at the door at the end of the table. I was facing the house with my back to the screen door. I was going to take some soda water, and was standing there with the water in a glass in my hand. I had put the dipper in the bucket, but had not turned to go back into the kitchen. All of the lights had 100-watt bulbs in them and no shades. While I was standing there with the water in my hand I knew there was something behind me, and I turned, and I saw him, and I screamed and ran, and just as I ran he grabbed my shoulder — just scratched the skin from this shoulder — and I went into the house. I went into the dining room and there met mother. That all occurred in just a flash. I could see him well enough to see him over my shoulder. That is the way I looked and saw him, and that is the only time I saw him there. I am sixteen years old. This assault occurred about eleven o'clock on Saturday night. The only others present were my mother and brother. My brother was in bed and my mother was in the living room. There are six rooms in the house with a back porch. There is no ell to the house; it is perfectly square. The veranda is at the back and the kitchen is at one end of it. The kitchen door opens onto the porch at the back. . . When I turned to run and jumped, he grabbed me. I don't know if I had already screamed when he grabbed me, I guess I screamed the instant I saw him, and he had not grabbed me at the time I saw him. He grabbed my shoulder with one hand and scratched me. I did not hear the screen door open. I was within a foot of the door, right in the door. I had my back squarely to *Page 305 
the door. The screen door does not make any noise in opening. I did not hear the screen door open. He was standing right in the door and it was open or partly open — it had to be the way he was standing. The scratches he made are right between my neck and shoulder, four of them. . . When I screamed and ran I do not know what became of the man, I did not hear the screen door slam. The 100-watt light bulb in the kitchen was shining on the porch through the partly open kitchen door — enough light to see on the porch. What kept me from seeing the man on the porch was, I was just not looking that way. He would have gotten hold of me if I had not jumped. If I had not gotten out of the way quickly he would have seized me and got hold of me. He was standing with one foot on the steps and kind of in the door. The screen door was on the other side of him. I believe one foot was on the porch from the way he was standing. That would make him stand just a little higher than me. . . I imagine it had to be that he was standing with one foot on the steps and one foot in the door. He was standing in the door, looking to be sideways, reaching. I know he would have to be in that position, standing as he was. The door had to be open for him to stand in the door. He was standing in the door. I was within one foot of the door."
Mrs. Sallie May Wilhite, mother of Miss Grace Wilhite, testified for the State: "On the 20th day of May, 1944, my daughter came by and asked me how much soda water she could take as she had been advised to take it. She got out of the bed and came through another room and through the kitchen and the water was not there and she went out on the porch. After she had been out there a short time she screamed just as loud as she could. . . She came running and I was ironing and I met her coming back screaming. The lights were on. It was about eleven o'clock. I had not gone to bed. My daughter had on her night clothes. She came back into the room where I was, screaming."
There is evidence of tracks near the back-porch steps and beneath the window of the bedroom of the young lady. There is no evidence as to when these tracks were made or by whom made.
In Dorsey v. State, 108 Ga. 477
(34 S.E. 135), the Supreme Court after having related the facts which in our *Page 306 
opinion more nearly tend to establish an assault with intent to rape than do the facts in the instant case, stated: "The main point upon which we place our judgment is, that the evidence does not show an intention on the part of the accused to have carnal knowledge of Mrs. Vines forcibly and against her will. An intention to do any one of three things might be inferred from this evidence: rob, frighten, or rape; or there might have been some other motive for his conduct, difficult to conjecture. It is not sufficient that the intent to do one may as likely be presumed as an intention to commit the others; but the question is: Is the intention to commit the crime charged `more likely to be true than any other?'" In the Dorsey case the court cites and comments upon many cases which had previously been before the court touching the question now before us in the instant case. Attention is called to cases with facts sufficient to sustain a verdict of assault with intent to rape, and other cases with facts insufficient to sustain such a verdict. The facts in the instant case, to our minds, clearly ally the facts of this case with the latter class. We have carefully studied and compared the cases and have reached the conclusion that the evidence in the instant case is insufficient to sustain a conviction of an assault with intent to rape. In addition to the cases cited inDorsey v. State, supra, we would like to call attention toHorseford v. State, 124 Ga. 784 (53 S.E. 322); Pauldo v.State, 29 Ga. App. 389 (115 S.E. 668); Little v. State,42 Ga. App. 222 (155 S.E. 352); Green v. State, 42 Ga. App. 437
(156 S.E. 637); Scott v. State, 63 Ga. App. 353
(11 S.E.2d 64).
Judgment reversed. Broyles, C. J., and MacIntyre, J.,concur.